1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TAMMY JANE KAHLER,

                              Plaintiff,

         v.

CAROLYN W. COLVIN. Commissioner of
Social Security,

                              Defendant.

Case No. 3:12-cv-05956-RJB-KLS

REPORT AND RECOMMENDATION

Noted for January 3, 2014

Plaintiff has brought this matter for judicial review of defendant's denial of her

applications for disability insurance and supplemental security income ("SSI") benefits.  This

matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v.

Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the

undersigned submits the following Report and Recommendation for the Court's review,

recommending that for the reasons set forth below, defendant's decision to deny benefits should

be reversed and this matter should be remanded for further administrative proceedings.

FACTUAL AND PROCEDURAL HISTORY

On May 25, 2006, plaintiff filed an application for disability insurance benefits and

another one for SSI benefits, alleging in both applications that she became disabled beginning

November 30, 2005, due to epilepsy, diabetes, anxiety, and depression. See ECF #13,

Administrative Record ("AR") 11, 135.  Both applications were denied upon initial

REPORT AND RECOMMENDATION - 1

administrative review on August 17, 2006, and on reconsideration on January 25, 2007. <u>See</u> AR 11.  A hearing was held before an administrative law judge ("ALJ") on March 12, 2009, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. <u>See</u> AR 32-55.

In a decision dated April 23, 2009, the ALJ determined plaintiff to be not disabled. <u>See</u> AR 11-21.  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on July 30, 2009, making the ALJ's decision the final decision of the Commissioner of Social Security (the "Commissioner"). <u>See</u> AR 1; <u>see also</u> 20 C.F.R. § 404.981, § 416.1481. Plaintiff appealed that decision to this Court, which on October 29, 2010, reversed and remanded the matter for further administrative proceedings due to the ALJ's errors in failing to properly consider the evidence in the record concerning her migraine headaches and bladder dysfunction. <u>See</u> AR 603-14.

Pursuant to the Court's order, on November 19, 2010, the Appeals Council vacated the ALJ's decision (<u>see</u> AR 585), and on February 23, 2011, a second administrative hearing was held before a different ALJ, at which plaintiff, represented by counsel, appeared and testified, as did a different vocational expert. <u>See</u> ECF #14, AR 775-809.  In a decision dated March 25, 2011, that ALJ also determined plaintiff to be not disabled. <u>See</u> ECF #15, AR 813-29.  It does not appear from the record that the Appeals Council assumed jurisdiction of the case. <u>See</u> 20 C.F.R. § 404.984, § 416.1484.  The ALJ's decision therefore became the Commissioner's final decision after sixty days. <u>Id.</u>  On November 7, 2011, plaintiff filed a complaint in this Court seeking judicial review of the Commissioner's final decision. <u>See</u> ECF #3.  The administrative record was filed with the Court on March 18, 2013. <u>See</u> ECF #13-#15.

The parties have completed their briefing, and thus this matter is now ripe for the Court's

REPORT AND RECOMMENDATION - 2

review.  Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits, or in the alternative for further administrative proceedings, because the ALJ erred in failing to properly consider the impact of both plaintiff's headaches and her neurogenic bladder requiring self-catheterization twice during the work day on her residual functional capacity.  For the reasons set forth below, the undersigned agrees the ALJ erred in failing to properly consider the impact of plaintiff's headaches on her RFC, and thus on that basis in determining plaintiff to be not disabled.  Also for the reasons set forth below, however, the undersigned recommends that while defendant's decision to deny benefits should be reversed, this matter once more should be remanded for further administrative proceedings.

DISCUSSION

The determination of the Commissioner that a claimant is not disabled must be upheld by the Court, if the "proper legal standards" have been applied by the Commissioner, and the "substantial evidence in the record as a whole supports" that determination. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); see also Batson v. Commissioner of Social Security Admin., 359 F.3d 1190, 1193 (9th Cir. 2004); Carr v. Sullivan, 772 F.Supp. 522, 525 (E.D. Wash. 1991) ("A decision supported by substantial evidence will, nevertheless, be set aside if the proper legal standards were not applied in weighing the evidence and making the decision.") (citing Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1987)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted); see also Batson, 359 F.3d at 1193 ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record."). "The substantial evidence test requires that the reviewing court determine" whether the Commissioner's decision is "supported

REPORT AND RECOMMENDATION - 3

by more than a scintilla of evidence, although less than a preponderance of the evidence is

required." <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).  "If the evidence

admits of more than one rational interpretation," the Commissioner's decision must be upheld.

<u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984) ("Where there is conflicting evidence

sufficient to support either outcome, we must affirm the decision actually made.") (quoting

<u>Rhinehart v. Finch</u>, 438 F.2d 920, 921 (9th Cir. 1971)). [1]

Defendant employs a five-step "sequential evaluation process" to determine whether a

claimant is disabled. <u>See</u> 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found

disabled or not disabled at any particular step thereof, the disability determination is made at that

step, and the sequential evaluation process ends. <u>See id.</u>  If a disability determination "cannot be

made on the basis of medical factors alone at step three of that process," the ALJ must identify

the claimant's "functional limitations and restrictions" and assess his or her "remaining

capacities for work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184

*2.  A claimant's residual functional capacity ("RFC") assessment is used at step four to

determine whether he or she can do his or her past relevant work, and at step five to determine

whether he or she can do other work. <u>See id.</u>

Residual functional capacity thus is what the claimant "can still do despite his or her

limitations." <u>Id.</u>  It is the maximum amount of work the claimant is able to perform based on all

---

[1] As the Ninth Circuit has further explained:

> . . . It is immaterial that the evidence in a case would permit a different conclusion than that
> which the [Commissioner] reached.  If the [Commissioner]'s findings are supported by
> substantial evidence, the courts are required to accept them.  It is the function of the
> [Commissioner], and not the court's to resolve conflicts in the evidence.  While the court may
> not try the case de novo, neither may it abdicate its traditional function of review.  It must
> scrutinize the record as a whole to determine whether the [Commissioner]'s conclusions are
> rational.  If they are . . . they must be upheld.

<u>Sorenson</u>, 514 F.2d at 1119 n.10.

REPORT AND RECOMMENDATION - 4

of the relevant evidence in the record. See id.  However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

With respect to the impact plaintiff's headaches has on plaintiff's RFC, the ALJ found in relevant part:

> The claimant began experiencing headaches in 2007.  The onset of symptoms was not related to any specific injury or illness.  Pain typically involves the forehead and biparietal area.  The claimant has been unable to identify specific triggers.  Nausea, vomiting, dizziness, and visual obscurations accompany headaches.  She treats symptoms with analgesics.  Nurse [Sandy] Niehm prescribed Midrin, which proved too strong and caused sleepiness. The claimant has tried preventative therapy with Amitriptyline and abortive therapy with Imitrex.  The claimant complained of headache pain to Marlene Dietrich, M.D., a neurologist.  She reported waking up often with a headache. Dr. Dietrich prescribed Ibuprofen, which reduced pain.  Pain improved in April 2007, when [the] claimant experienced about one headache per week. In October 2007, Dr. [Steven A.] Day assessed typical migraine without aura. The claimant reported very good headache response with Immitrex 100 mg, and stated Imitrex "wiped out my headaches".  She was very pleased with her response to this medication and suffered no side effects.  Dr. Day also recommended lifestyle changes, including aerobic exercise such as vigorous walking 20 to 30 minutes three times a week; and consistent sleep, regular meals, and avoidance of potential food triggers.  In December 2008, Dr. Dietrich diagnosed recurrent migraines and prescribed Top[a]max and Fioricet.  Use of Fioricet as needed provided "considerable relief".  Headaches worsened after [the] claimant stopped taking Topamax.  In February 2009, she told Dr. Day she was "very happy" with her current headache control.  She had experienced four headaches in the previous month that resolved with Imitrex.  In March 2010, Nurse Niehm indicated current headache symptoms were related to tension instead of migraines.  The claimant reported feeling anxious.  Dr. [Elena] Robinson prescribed magnesium and ginger root in July 2010. (Exhibits 14F/1, 3, 7-8; 18F/70, 105; 19F/12, 20; 20F/7-8).  The claimant presented to Dr. Robinson again in January 2011 and complained of acute migraine.  The claimant had not taken the prescribed ginger root.  The doctor treated migraine pain with Visteril and Dilaudid.  The claimant

REPORT AND RECOMMENDATION - 5

> reported "very significant improvement and essential resolution" of her acute migraine with this treatment.  She has not tried other forms of treatment, such as acupuncture or massage. (Exhibit 20F/5, 10).
>
> The objective evidence shows headache pain either decreased or completely resolved with treatment, including use of Ibuprofen, Imitrex, Topamax, Fioricet, Vistaril, and Dilandid.  The residual functional capacity considers residual symptoms by restricting the claimant to only simple, repetitive work.

AR 819-20.  Plaintiff argues the ALJ erred in failing to adequately consider the evidence in the record concerning her headaches, and in finding the only restriction caused by her headaches to be a limitation to simple, repetitive work.  The undersigned agrees.

As plaintiff points out the record does not clearly show her headaches had "decreased or completely resolved with treatment" (AR 280), at least in terms of the longitudinal record.  In mid-August 2005, plaintiff reported using Excedrin Migraine "with modest relieve [sic] of her headaches." AR 226.  In late October 2005, she reported having "a lot of bad headaches," but they were "not occurring on a daily basis." AR 343.  In late September 2006, plaintiff reported having "headaches pressure" related to her seizure disorder.AR 285.

In early March 2007, plaintiff told Nurse Neihm she had "had an ongoing headache for the last 1 week," even though she was "taking her medications as prescribed." AR 524.  Also in early March 2007, plaintiff told Dr. Dietrich she had been having "severe headaches the last couple of weeks," which were "especially bad the last three days," and she described having "a bad headache" currently. AR 338.  She further reported at the time that using one tablet of Fioricet twice per day "helps relieve the pressure somewhat," and that "[t]hree in one day actually gives her considerable relief." Id.  In late April 2007, plaintiff stated her headaches were "better, though she still [was] getting one about once per week." AR 336.

In late July 2007, plaintiff reported "having increasing headaches again in the last couple weeks," stating they were "lasting all day but fluctuating in severity." AR 334.  In late

REPORT AND RECOMMENDATION - 6

September 2007, she reported that she thought her headaches had "been occurring now for a number of months," that the "current frequency" thereof was "between one to two" per month and that they worsened "with activity." AR 484.  Plaintiff also reported that when her headaches occur she "tends to lay down to rest with some improvement of the head pain," and that she "was given Midrin to try" but did "not think that this was a benefit for her." Id.  Plaintiff was provided with Imitrex (see AR 485), which she reported as being "effective in reducing headache symptoms," in early October 2007.  AR 548.

Plaintiff again reported having "very good headache response" to Imitrex in late October 2007, stating further that she had "had only two migraine headaches" since late September 2007, that the Imitrex "wiped out" the headaches, that she "had no adverse side effects" from that medication, and that she was "very pleased" with her response to it. AR 480.  But in mid-December 2007, plaintiff reported that she had a headache frequency "of about 2/week," and that during "[t]he first week of November she had a single headache which lasted the whole week," though she also reported that Imitrex "continues to be beneficial." AR 472.  In late January 2008, plaintiff reported having two to three headaches per week "associated with nausea and blurred vision," and requiring her "to lay down" (AR 369), and in late February 2008, she reported "having more headaches than usual" (AR 465).

In late April 2008, plaintiff reported experiencing "worse" headaches since "being off" Topamax "for the last two weeks due to [her] insurance company not wanting to cover it," with the headaches occurring "daily" , including "severe" headaches twice a week. AR 445.  Despite the "question of ongoing coverage," use of other medications was not recommended due to potential impact on other health conditions. Id.  In mid-July 2008, plaintiff reported a headache frequency of "2-3 per week," in regard to which she also reported Imitrex "cut [her] pain in ½,"

but also in regard to which she was "reluctant to repeat dose due to heart palpitations." AR 430.

Plaintiff's headaches were deemed to be "[i]ntractable" and "incompletely controlled on

Topamax as [a] preventive agent." Id.

Plaintiff again reported in early August 2008, that she was "out of Topamax," which her

insurance company would not approve for her. AR 540.  In late August 2008, plaintiff reported

improvement in her headaches. See AR 539.  In mid-September 2008, though, she reported that

her headaches had "worsened since stopping the Topamax" and that she estimated having "about

15 headaches in the month of August, one of which was severe." AR 405.  It was further noted

that:

> In the last two weeks she estimates that she has had 5 headaches most of
> which are in the range of 4/10 to 5/10 although she had one severe headache
> which was 10/10.  For the most typical headache she takes one Imitrex and
> takes a nap for about an hour and wakes up with moderate benefit.  For the
> more severe headache she took an Imitrex and required repeat dosing two
> hours later.  Again Imitrex did not take away her pain completely but did help
> reduce severity.

Id.  Once more plaintiff's medication options were noted to be "somewhat limited" due to her

other health conditions, although Depakote was prescribed. Id.

While the record does not explain why she did so, plaintiff reported in early November

2008, that "at some point" following her mid-September 2008 treatment visit she discontinued

the Depakote. AR 390.  However, it also was noted at the time that plaintiff:

> Reports being on gabapentin . . . for two weeks.  She denies any adverse side
> effects.  She has had just 6 headaches in the last two weeks all of which in the
> 1-2/10 range, and none of these required use of Imitrex.  She is very happy
> with her current headache control.

AR 391 ("Her headaches have been better in the last two weeks on low-dose gabapentin and low

dose amitriptyline.").  In mid-December 2008, plaintiff reported "getting a lot of bad migraines"

that "were occurring about once per week for a while and then did not occur for several weeks,

REPORT AND RECOMMENDATION - 8

but now [were] occurring on a weekly basis again." AR 340.  She further reported being given Midrin by Nurse Neihm, but stated it was "too strong" and made her "too sleepy, even when she just takes one tablet at night." Id.

In early February 2009, plaintiff noted having headaches "3 to 4 times per week, more of a pressure at times." AR 378.  In early March 2009, she presented with a headache she reported having had "over the last two weeks," although she felt it might be related to the medication she was taking for depression. AR 744.  In late March 2009, plaintiff reported that by February 2009, her headaches had "worsened" again "without "apparent trigger." AR 743.  She reported having experienced "17 days of headache" during the month of March, with her level of pain "being between 5/10 and 10/10." Id.  Plaintiff further reported that "[s]ome of the headaches last [a] few days in a row," with "[a] few . . . associated [with] nausea and even vomiting," and that she had had a headache for the past six days. Id.

In early May 2009, it was noted that:

. . . She reports her headaches have improved slightly with increasing dose of amitriptyline . . . nightly.  She is no longer taking the fioricet as instructed. Headache log is reviewed which indicates 9 days of headache since our last visit.  She had daily headache from April 1 through April 5 and then did not have any headache until April 27.  She reports having 10 out of 10 headache today as well as a headache yesterday which was 8/10. . . . Taking Imitrex one tablet with moderate or complete resolution of her headache.  Has not redosed.

AR 741.  In early July 2009, plaintiff reported having "had a dramatic improvement in her headache frequency." AR 736.  She reported having only "had one headache within [the] last month on May 15," and being "very happy with this reduced frequency in headaches." Id.  She was noted to be "improved on increased does of amitriptyline." AR 737.  Plaintiff again reported she was "very happy with her current headache control" in late July 2009, experiencing "4 migraine headaches in the last month responsive to Imitrix," with "some morning time

REPORT AND RECOMMENDATION - 9

grogginess but otherwise . . . doing well." AR 726.

In mid-March 2010, though, the following was noted:

> . . . [Plaintiff] had been seen by . . . Neurology . . . and had been trailed on several medications with [her] having had side effects from Imitrex, Neurontin, and Amitriptyline.  She was to return to Neurology but they currently are not accepting patients. . . . She has had a headache since last Thursday with nausea . . . She has not taken prescription medications for this but used over-the-counter medications which have not helped.  She states that over the last several months she has had increasing headaches lasting several hours to several days. . . .

AR 717.  In early May 2010, plaintiff reported taking Midrin "with minimal relief." AR 715.  In mid-May 2010, she reported having "a headache for several weeks and with no relief she went to the ER and was given medications IV with minimal relief." AR 713.  She also reported at that time having "been seen at . . . Neurology for headaches with treatment that was overall effective until she ran out of medication." Id.

In late July 2010, plaintiff reported that her headaches "tend to recur numerous times per week" without "any specific triggers," and that nausea and vomiting are associated with them. AR 769.  She also complained of dizziness and "visual obscurations," and reported that "[i]n the past" she "did not benefit from preventative therapy with amitriptyline and abortive therapy with Imitrex." Id.  In early November 2010, plaintiff presented "with a headache . . . she has had since yesterday," but reported that it was "not the worst headache of her life." AR 711.  She also reported that she "was seen by neurology 4 days ago and was given shots [f]or [p]ain and nausea," and that her "headache went away and [she] was doing fine until yesterday." Id.  Finally, in early January 2011, plaintiff reported experiencing "severe exacerbation of her chronic migraine headaches" due to an uncertain trigger, in regard to which she described "pain as 10/10" and complained of "significant sensitivity to light, sound, and nausea." AR 766.  Her migraine headaches also were described as "intractable". AR 767.

REPORT AND RECOMMENDATION - 10

Clearly, the record shows there were periods of time during which plaintiff experienced significant improvement on her medication.  However, it also shows her medication was not always completely effective in ameliorating her headache symptoms.  The record shows as well that there were at least as many periods of time, if not more, during which plaintiff experienced exacerbations in her symptoms, particularly most recently.  Further, while plaintiff did report having no adverse medication side effects on at least one occasion, such side effects were noted on others, and some medications were contraindicated due to health concerns.

The evidence in the record concerning medication non-compliance is also mixed.  While on at least two occasions plaintiff was noted to have not taken her medication as prescribed, she continued to use at least one such medication through at least May 2010, but with minimal relief. Defendant is correct that in any case involving the waxing and waning of symptoms, evidence of increased difficulties must be balanced with evidence of reduced difficulties.  The ALJ, however, failed to properly balance the evidence in this case.  Indeed, the ALJ's above summary leaves out much of the evidence of those periods during which plaintiff experienced increased symptoms or less than complete resolution thereof on medication.  Nor does that summary accurately take into account the fact that those periods of non-compliance that did occur do not always or necessarily coincide with plaintiff's periods of exacerbations.

The ALJ is responsible for resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the evidence in the record is not conclusive, "resolution of conflicts" is solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  In resolving questions of credibility and conflicts in the evidence, though, the ALJ's findings "must

REPORT AND RECOMMENDATION - 11

1   be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by

2   setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating

3   his interpretation thereof, and making findings." Id.

4          As discussed above, the ALJ did not set out a sufficiently detailed and thorough summary

5   of the evidence in the record concerning plaintiff's headaches.  Specifically, she left out much of

6   the evidence regarding those periods during which plaintiff experienced symptom exacerbations

7   and incomplete resolution on prescribed medications.  The ALJ also did not adequately evaluate

8   to what extent, if any, plaintiff's non-compliance with recommended treatment actually impacted

9   those periods of exacerbation.  The ALJ, furthermore, failed to mention much of the evidence in

10  the record concerning medication side effects,[2] and did not take into adequate account any of the

11  reasons plaintiff may not have taken prescribed medications, including lack of insurance

12  coverage and potential health concerns. [3]  In addition, as noted by plaintiff, no "logical

13  explanation" was provided by the ALJ as to why a restriction to simple, repetitive tasks is

---

[2] See Erickson v. Shalala, 9 F.3d 813, 818-19 (9th Cir. 1993) (ALJ must consider impact medication side effects may have on ability to work).  Defendant asserts plaintiff experienced no more than minimal medication side effects. But it is not at all clear the record supports that contention.  For example, plaintiff reported in mid-July 2008, that she was reluctant to continue repeating her dose of Imitrex because of heart palpitations. See AR 430.  In any event, given the other reports in the record of side effects relating to various medications noted above, at the very least this is an issue the ALJ should have considered, but did not do so other than the one mention of plaintiff's report of no adverse side effects from Imitrex in late October 2007. See AR 480.  Indeed, it is just such conflicting evidence that the ALJ has a duty to address, but failed to do so here.

[3] See SSR 96-7p, 1996 WL 374186 *7 (ALJ must not draw any inferences about claimant's symptoms and their functional effects from his or her failure to follow prescribed treatment, without first considering any explanations claimant may provide or other information in record which may explain that failure); see also Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995) (benefits may not be denied due to failure to obtain treatment because of inability to afford it); 20 C.F.R. § 416.930(c)(4) (claimant may decline to follow recommended treatment due to severity of health risks).  Defendant asserts plaintiff's lack of insurance coverage is of no moment, because it concerned only the Topamax she was taking and because loss of coverage occurred in 2008.  But the ALJ did not give these as reasons for finding the evidence in the record supports a determination of complete resolution of plaintiff's headache symptoms on medication. See Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001) (court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision"); Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (error to affirm ALJ's decision based on evidence ALJ did not discuss).  Indeed, it is not at all clear that the ALJ was even aware of plaintiff's lack of insurance coverage as she made no mention of it. See AR 819-20.  Rather, the ALJ appears to merely have assumed plaintiff stopped taking this medication without considering whether she had any good reasons for doing so.

REPORT AND RECOMMENDATION - 12

1  supported by the record. [4]

2         The Court may remand this case "either for additional evidence and findings or to award

3  benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the

4  proper course, except in rare circumstances, is to remand to the agency for additional

5  investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations

6  omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is

7  unable to perform gainful employment in the national economy," that "remand for an immediate

8  award of benefits is appropriate." Id.

9

10        Benefits may be awarded where "the record has been fully developed" and "further

11 administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan

12 v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded

13 where:

14
15           (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the
             claimant's] evidence, (2) there are no outstanding issues that must be resolved
16           before a determination of disability can be made, and (3) it is clear from the
             record that the ALJ would be required to find the claimant disabled were such
17           evidence credited.

18 Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).

19 Because issues still remain in regard to the evidence in the record concerning the actual impact

20 of plaintiff's headaches on her residual functional capacity, and therefore her ability to perform

21 other jobs existing in significant numbers in the national economy and thus whether or not she is

22

23

24 _____

25 [4] SSR 96-8p, 1996 WL 1996 WL 374184, *7.  The ALJ's general statement that "[t]he residual functional capacity
   considers residual symptoms by restricting the claimant to only simple, repetitive work" (AR 820), hardly explains
   why this is so, let alone point out those residual symptoms the ALJ's RFC supposedly considered.  Further, although
26 the Court certainly can draw "specific and legitimate inferences from the ALJ's opinion," it is impossible to discern
   from the ALJ's summary of the evidence in the record how she arrived at the one functional limitation she imposed.
   Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

REPORT AND RECOMMENDATION - 13

disabled,[5] remand for further administrative proceedings is warranted.

Plaintiff argues remand for payment of benefits is warranted in this case, because the vocational expert testified that having two work absences a month would prevent competitive work activity. See AR 808. The record at this time, however, does not necessarily support a determination that plaintiff's headaches would cause her to miss at least two days of work per month. That is, while plaintiff has reported significant headache symptoms that at times have lasted for up to a week and/or have occurred at a frequency of more than twice a month, as well as a need on occasion to lie down when she has them, the record – including the reports plaintiff made to her treatment providers – fails to definitively show she has been incapacitated to such an extent that she would miss that amount of work. Accordingly, remand for further consideration of the impact of plaintiff's headaches is warranted.

CONCLUSION

Based on the foregoing discussion, the undersigned recommends the Court find the ALJ improperly concluded plaintiff was not disabled. Accordingly, the undersigned recommends as

---

[5] If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).
An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Id. (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).
At the hearing, the ALJ posed a hypothetical question to the vocational expert containing substantially the same limitations as were included in the ALJ's assessment of plaintiff's residual functional capacity. See AR 807. In response to that question, the vocational expert testified that an individual with those limitations – and with the same age, education and work experience as plaintiff – would be able to perform other jobs. See AR 807-08. Based on the testimony of the vocational expert, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy, and therefore not disabled. See AR 827. But because as discussed above, the ALJ erred in failing to properly consider the impact of plaintiff's headaches on her residual functional capacity, it cannot be said at this time that the hypothetical question the ALJ posed to the vocational expert and thus the ALJ's reliance on the vocational expert's testimony in response thereto in making her step five determination, is supported by substantial evidence.

REPORT AND RECOMMENDATION - 14

well that the Court reverse defendant's decision to deny benefits and remand this matter for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **January 3, 2014**, as noted in the caption.

DATED this 17th day of December, 2013.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 15